**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE:<br><br>The Reserve Club of Pawleys Island, LLC,<br><br>Debtor. | Case No. 09-09116-jw<br>Chapter 11 |

The Official Committee of the Unsecured Creditors, submits this objection to the Debtor's Motion for Order Authorizing :(1) The Sale of Assets of the Debtor Free and Clear of Certain Liens, Claims, Encumbrances, and other interests pursuant to 11 U.S.C. §363, and (2) Authorizing the Assumption and Assignment of Certain Executory Contracts Pursuant to 11 U.S.C. §365.

**I.      Introduction**

The Court should reject the Debtor's Motion because (1) the Debtor's motion is a *de facto* plan of reorganization which could not be approved under 11 U.S.C. §1129, (2) the proposed sale is unfair to unsecured creditors because it offers significant benefits to the current equity holders while effectively eliminating $2.7 million in unsecured claims, (3) the proposed purchase price is unfair because it is overstated by the Debtor and not sufficient in light of the value of the assets, and (4) the proposed sale is a product of collusion between the buyer and the equity holders and members who will receive significant economic and non-economic benefits under the sale, (5) there is no emergency or sound business justification for making the sale immediately and without a disclosure statement and plan.  Furthermore, the Court should not approve the assumption and assignment of executory contracts because there is no business justification for the assignment without the approval of the sale.

**II.     Background**

The Debtor is a private golf club owned by its members. Some members paid for an equity share in the company. In addition to the equity shares, members pay dues and fees per round played. Membership in the Club is open to anyone. The Club was formed in 2006 when the neighborhood developer sold the course, buildings and equipment to the Debtor for $1.25 million.

When joining the Club, new members paid a "membership fee." The Club agreed to repay 90 percent the membership if a member resigns. This fee is to be repaid "thirty days after the reissuance of the resigned Reserve membership by the Club to a successor member." See Exhibit 1, Reserve Membership Certificate. There are approximately 175 such former members who are entitled to payments of approximately $2.7 million.

The Club is located in a neighborhood known as Pawleys Island Reserve. The Club pays an annual assessment to the Pawleys Island Reserve Homeowners Association (the "HOA") pursuant to restrictive covenants.

The assets of the Club include 329 acres of real property and buildings which are restricted by title covenants to use as a golf course until 2056. The Debtor valued this real property at $750,000 in its schedules. At the time of filing, there was no claim secured against the property, but the Debtor has obtained post-petition financing of $80,000 to be secured by a mortgage against the property. The Debtor also lists personal property of $409,343.

The Debtor listed total unsecured claims of $229,000. The Debtor listed no amount for the claims of former club members.

The Debtor wanted to make improvements to the golf course, but it did not have income sufficient to maintain the facilities at a level that the members desired. The board of managers for

the Debtor proposed capital improvements to be paid for by assessments against the membership. The members of the Debtor rejected plans to charge these assessments or to raise dues to make the improvements. The members also rejected plans that would open the Club to public play.

In or about May 2009, the Board announced a plan to sell the assets of the Club to an entity owned by McConnell Golf, LLC ("McConnell"). Under that contract, the Club would sell all the assets for in return for the assumption of trade debt. While the deal offered no cash, Club members supported the proposal because McConnell promised key future benefits to the member/owners. McConnell offered to infuse $2 million in capital to the make the upgrades that the member/owners refused to fund themselves. McConnell offered to honor all current memberships and credits. McConnell offered to cap dues and to not make any new assessments against members. McConnell also offered to open other courses owned by the company to reciprocal membership for the Club members.

A key point for the member/owners and for the HOA was the fact that McConnell offered to maintain the private nature of the course for at least 10 years. HOA members fear that the presence of a public course would decrease their property values, and Club members enjoy the exclusive nature of a private golf club. In fact, the HOA and owner/members have insisted that the property restrictions prevent the course from being used as a public facility absent significant payments to the HOA. See *Order Establishing Bidding and Other Procedures in Connection with the Sale of the Debtor's Assets and Granting Protections to the Proposed Buyer*, Docket No. 55.

McConnell promised to pay the trade debts of the Club. However, former members of the Club were to receive nothing under the sale. The $2.7 million in payments to the former members

were to be cut out. The member/owners of the Club voted to accept McConnell's offer and to "extinguish" the claims of the former members.

Four former members of the Club filed a class action lawsuit in the Georgetown County Court of Common Pleas seeking a declaration regarding their rights against the Club and seeking damages for breach of contract.

The owner/members of the Club decided that they could not afford to prosecute the lawsuit and filed this bankruptcy in an attempt to end the suit and consummate the sale to McConnell. See Exhibit 3, Letter to All Shareowners and Dues-Paying Refundable Members, dated October 13, 2009. The Board told the member/owners that it could not sell the assets until it "satisfactorily disposed of the complaint." The Board recommended filing for bankruptcy "to bring the complaint to a close forever through the bankruptcy process and in facilitation the contemplated sale to [McConnell]."

In its pitch to the member/owners to file bankruptcy, the Board explained the "formidable benefits" for the Club owner/members in the sale to McConnell. See Exhibit 3. Those benefits include:

- that the club membership would remain exclusive and private;
- that the club would receive up to $2 million in course upgrades;
- that members would receive reciprocal golf privileges at other McConnell courses;
- that current memberships and credits would be honored by McConnell;
- that McConnell would place a cap on dues to be charged to the members;
- that McConnell would not make additional assessments against the members.

In October, 2009, the membership voted in favor of the plan to sell the Club through bankruptcy, and the Debtor filed this case on December 4, 2009.

The Debtor has not filed a disclosure statement or plan of reorganization.

### III.     Authority and Argument

### A.     Legal Standard for sale outside the normal course of business.

In order to sell the property pursuant to 11 U.S.C. § 363(b)(1) outside the ordinary course of business prior to filing a plan of reorganization, the Debtor bears the burden of demonstrating that such sale meets the sound business purpose test. Although sales are usually proposed and conducted pursuant to a plan of reorganization, this Court has recognized that when a sound business justification exists, the Court may authorize a sale pursuant to 11 U.S.C. § 363(b)(1) without a confirmed plan of reorganization. *In re Taylor,* 198 B.R. 142, at 156-57 (Bkrtcy.D.S.C.,1996);see *also Stephens Indus., Inc. v. McClung,* 789 F.2d 386 (6th Cir.1986); *In re WBQ Partnership,* 189 B.R. 97 (Bankr.E.D.Va.1995).

> Under the sound business purpose test, the Debtor has the burden of proving that:
>
> A. sound business reason or emergency justifies a pre-confirmation sale;
>
> B. the sale has been proposed in good faith;
>
> C. adequate and reasonable notice of the sale has been provided to interested parties; and
>
> D. the purchase price is fair and reasonable.

*In re Taylor,* 198 B.R. at 157.

A sale of all of the bankruptcy estate's assets may, and probably does, have the practical effect of deciding issues that would ordinarily arise and be resolved in connection with the confirmation of a plan of reorganization. *In re Dewey Ranch Hockey, LLC,* 414 B.R. 577

(Bkrtcy.D.Ariz.,2009). Because there is a real danger that a § 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under § 363 must be scrutinized closely by the court. Attempts to determine plan issues in connection with the sale will be improper and should result in a denial of the relief requested. *Id. citing 3 Collier on Bankruptcy ¶ 363.02[3], at p. 363-17 (15th ed. rev.2007)*. If a proposed plan of reorganization is contested, it can only be confirmed if, among other requirements, it does not discriminate unfairly, and is fair and equitable, with respect to each claim of creditors that is impaired by such plan. *Id.*

A Debtor cannot enter into a transaction that would "amount to a *sub rosa* plan of reorganization" or attempt to circumvent the Chapter 11 requirements for confirmation of a plan of reorganization. *In re General Motors Corp.,* 407 B.R. 463 (Bkrtcy. S.D.N.Y. 2009). The Bankruptcy Court must not authorize a § 363(b) transaction if the transaction would effectively evade the carefully crafted scheme of the Chapter 11 plan confirmation process, such as by denying §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) rights. Transactions that explicitly release all (or virtually all) claims against the estate, predetermine the structure of a plan of reorganization, and explicitly obligate parties to vote for or against a plan are not authorized under § 363(b). *In re Gulf Coast Oil Corp.,* 404 B.R. 407 (Bkrtcy.S.D.Tex.,2009). The debtor in possession or trustee in a Chapter 11 case must consider its fiduciary duties to all creditors and interest holders before seeking approval of a transaction under § 363(b). *Id.*

**B.    The sale has not been proposed in good faith.**

Approval of this sale under § 363 will allow the Debtor to circumvent the requirements of 11 U.S.C. §1129 and allow the Debtor to consummate an inside sale that will benefit current owners

of the Debtor while cutting off the rights of unsecured creditors. The circumstances surrounding the filing, the proposed sale, and the notice procedures, and the purchase price all indicate that the Debtor is improperly using the § 363 sale procedure to cut out the former members claims while providing significant benefits to the current owners and members. Therefore, the Debtor has not proposed the sale in good faith, and the Debtor's motion must be denied.

The Debtor has proposed to sell the property under § 363 because the Debtor cannot propose a confirmable plan on the same terms. Under 11 USC §1129, the Debtor could not confirm this sale/plan over the objection of the unsecured creditors because:

- the sale/plan violates the absolute priority rule 1129(b)(2)(B)(ii);

- the sale/plan does not pay unsecured creditors the amount they would receive in a Chapter 7. 1129(a)(7).

A liquidation analysis based upon the Debtor's schedules demonstrates that the Debtor could not obtain approval for a plan of reorganization under Section 1129(a)(7). The Debtor lists assets of $1.159 million and debts of $227,000. The Debtor does not list amounts for the claims of former members, which are estimated to total $2.7 million. If the Debtor sold the assets for the value listed in the schedules, the Debtor could pay all other unsecured creditors in full and still apply $932,000 to the class of former members. Under the proposed sale to McConnell, the Debtor proposes a carve out of only $67,000 from funds contributed by the HOA. The Debtor cannot justify the McConnell sale under a liquidation analysis, and therefore, the Debtor could not confirm a plan on the terms which it seeks to impose through this sale.

The sale could not be approved through a Plan because the proposal violates the absolute priority rule set forth in Section 1129(b)(2)(B)(ii). Under the absolute priority rule, the court may

not approve a plan which provides that shareholders receive any property when unsecured creditors remain unpaid.

The current shareholders of the club will receive the following benefits from the sale:

1. Current members will be admitted as members of the Buyer's club and receive credit for membership time already paid; *See Purchase Agreement Sections 9.6, 9.2 and 2.1(i)*;

2. A commitment that McConnell will spend $1 million toward golf course improvements; *Section 3.1(iii);*

3. A commitment that McConnell will spend up to $1 million to fund operating losses; *Section 3.1*;

4. Reciprocal membership privileges at other courses owned by McConnell; *Section 9.7*;

5. An agreement that the club retain private status; *Section 9.4*;

6. An agreement to cap membership dues; *Section 9.5*;

7. An agreement to that the new owner will make no assessments; *Section 9.3*;

8. An agreement to honor current guest passes and shop credits; *Section 9.2*;

All these benefits have a cost. The member/owners specifically refused to pay for these very same benefits by rejecting plans for assessments and dues increases. Under this proposed sale, the cost of these benefits is unfairly saddled on the back of a the former members, who are not to be paid from any of the proceeds of sale.

In addition to these direct benefits based upon their equity, the current shareholders are receiving benefits in the form of McConnell's capital contribution to the Club. The shareholders benefit from the McConnell's contractual capital contribution of $2 million, which is to be used for improvements to the golf course and operating losses. No other creditor benefits from the future

capital contribution to the Club. Thus, current equity holders will receive the benefit of the $2 million in capital under the sale, but the former members will receive nothing.

The shareholders also have a strong interest in having the Club remaining a private membership club. The shareholders obtained a promise from the McConnell to keep the Club private for at least 10 years. This benefit has a cost because the course can generate more rounds if it is open to the public. The Debtor and the HOA have made clear their desire that the course remain private. However, there is a cost to having your own private golf club. If the shareholders want to maintain their exclusive club, they should buy it. However, the current member/owners want to maintain their exclusive club without paying for it. Instead, they want the former members to bear the cost of the shareholders' desire for exclusivity. Under the proposed sale, the claims of the former members are cut out so that the current owners and members can maintain their private club.

The fact that current shareholders will receive direct and indirect financial benefit from the McConnell transaction in preference to the former members indicates that the Debtor has not proposed this sale in good faith. The sale is a bad faith attempt to avoid the restrictions of section 1129, and must be denied.

**C.    The notice of sale is not adequate or reasonable.**

The Debtor's notice of sale is not adequate or reasonable. The inclusion of a $100,000 "expense reimbursement fee" when such fee was not necessary is a further indicia of bad faith and indicates the Debtors attempts to discourage fair offers on the property. The sale procedure is designed specifically to favor the McConnell and discourage other bidders from making offers on the property. The Debtor and McConnell have been trying to close this sale on essentially the same terms for a year, and the reimbursement fee is an attempt to thwart other bids. The bankruptcy filing

was specifically made to facilitate this particular sale by ending the state court lawsuit to determine the rights of the former members. There is no need for the expense reimbursement fee, and the fee has a chilling effect on offers.

Agreements to pay a break-up fees or expense reimbursement fees are incentives designed to encourage potential purchasers to bid for assets by compensating a stalking horse to attract more favorable offers. *In re Paintball, Inc.*, Dist. S.C. Bankruptcy Case: 03-8807 (2003); citing *In re S.N.A. Nut Company*, 186 B.R. 98, 101 (Bankr. N.D.Ill. 1995). Factors to be considered in evaluating the approval of such fees are: (1) whether the underlying agreement is an arms-length transaction, (2) whether the principal secured creditors and creditors committees support the fee, (3) whether the fee is a reasonable percentage of the proposed purchase price, (4) whether the fee is so substantial that it provides a "chilling effect" on potential bidders; (5) the existence of available safeguard beneficial to the debtor's estate, (6) whether the fee creates substantial adverse impact upon unsecured creditors. *Id*. Citing *In re Hupp Industries, Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992).

The fee in this case is unreasonable and will discourage fair offers on the property. First, the underlying agreement is not an arms-length transaction. As outlined above, the current member/shareholders stand to get "formidable" benefits from this offer at the expense of the former members. Second, the unsecured creditors committee does not support the fee. Third, the fee is not reasonable in light of the proposed purchase price. The proposed fee is 19 percent of the purchase price as stated by the Debtor. While break-up fees are not subject to easy application of a range of percentages, courts have cited that the industry standards for such fees are 3.3 percent. *In re Integrated Resources, Inc.*, 135 B.R. 746 (Bankr. S.D.N.Y. 1992). The court has refused to approve fees as low as 7.5 percent. See *In re Paintball, Inc.*, *supra*. This Court noted that a $200,000

expense reimbursement fee was uncustomarily high in a transaction involving in excess of $16 million. *In re Georgetown Steel*, S.C. Bankruptcy Case: 03-13156, Docket 658. A fee of nearly 20 percent the sale price would chill other offers and indicates that the sale notice is not reasonable.

The fee is especially large when considered in light of the fact that there was no need to induce McConnell to make this offer. This offer has been pending for several months, and the Debtor's explicit purpose in filing this bankruptcy is to consummate the sale to its chosen successor. There is no need to offer an inducement to McConnell to obtain this bid. Therefore, one of the central purposes of approving reimbursement fees is not present in this case.

The fee is not an actual and necessary expense of the estate in this case which could be approved under 11 U.S.C. §503. In light of the Debtor's pre-petition contract with McConnell and the statements of the board of managers, the reimbursement fee appears calculated to discourage, rather than encourage, bidding on the project. The inclusion of this provision is further evidence that the Debtor is trying to push through an insider deal that benefits current members/owners while excluding the former members claims. Therefore, inclusion of an unapproved fee on the notice of sale is an indication that the notice was not fair and reasonable.

The Debtor's sale notice also includes inclusion of a statement regarding the HOA's and the Debtors interpretation of a title restriction. The quoted section of the provision provides that the HOA may charge a buyer *any amount* if the course is opened to use as a public facility. This completely unrestricted right to charge a public golf course is probably not an enforceable covenant. Regardless, the inclusion of this covenant in the notice of sale serves the purpose of discouraging third-party offers from companies which might see profit in the operation of a public course. By the inclusion of such language, the Debtor makes it clear that it does not want bids from parties who might operate the course as a public facility. Such restriction benefits the current equity holders and

members of the club at the expense of the former members who are not receiving payment of their interest.

The notice and sale procedure in the bankruptcy court have not provided adequate time for legitimate bidders to analyze the property. The Debtor decided long ago to use bankruptcy to cut off objections to its sale to McConnell. See Exhibit 2, Statement of Board of Managers. Yet, Debtor's notice of sale was only recently published in a single golf trade publication. It would be unreasonable to assume that any potential purchaser could analyze the sale in the days between the publication of the notice and the sale. This case was only filed in December 2009, and the committee of unsecured creditors was only assembled in January 2010. The Debtor is seeking to force this sale before other bidders, whose operating plans might not include the benefits that McConnell has offered, can be found. The timing and notice of the sale are unreasonable and the sale must be denied.

The Debtor also inflates the value of the McConnell offer, and that discourages other offers on the property. The Debtor claims that the value of the offer is $522,705. This "value" includes "up to $80,000" to pay off post-petition financing. However, the operating statements indicate that this money has not been received or spent. Therefore, the value of the offer is overstated by $80,000. Overstating the value of the current bid discourages competing bids and demonstrates that the notice of sale is not reasonable.

**D.    The purchase price is not fair.**

The purchase price for the McConnell sale is not fair because it is less than half the stated value of the assets and includes items that are not properly considered in the purchase price. The Debtor misstates the value of the McConnell purchase price. According to the Debtor's addendum to its motion to sell, the purchase price is $522,705, "plus a commitment to infuse significant new

capital to fund capital improvements and offset negative cash flow." As stated above, this $522,705 value is not correct in light of the Debtor's current cash position. This figure includes $80,000 for repayment of post-petition financing which has not been used. Therefore, the value of the offer is overstated by at least $80,000.

Regardless of the accuracy of the Debtor's statement, the alleged purchase price is less than one-half the $1.15 million value of the assets set forth in the schedules, and less than half the $1.25 million purchase price of the club in 2006. A purchase price of less than half the Debtor's own estimates of value is unfair to the unsecured creditors who are not being paid on account of their claims.

The Debtor claims that the purchase price includes financial commitments to capital improvements and to fund future operating losses. These amounts are not properly considered part of the purchase price. The beneficiary of these capital improvements is McConnell, not the Debtor. In any arms length transaction, a seller has no stake in the buyer's future capital improvements. The value received by the seller is not affected by money the buyer promises to spend in the future. Essentially, McConnell is promising to spend money for its own benefit, and none of those funds are going to go toward paying the unsecured creditors. Therefore, the promise to provide capital improvements should not be considered part of the purchase price for this property.

The reason the financial commitment is important to the Debtor is that the current shareholder/members stand to benefit directly from this infusion of capital. As pointed out *supra*, providing benefits to the current equity holders while not paying the unsecured claims of former members is a violation of the absolute priority rule. In addition to violating that provision of bankruptcy law, the offer to make capital improvements for the benefit of the Debtor's current membership is essentially a kickback to those members to induce them to support the sale. When

considered in light of the low purchase price, the post-sale benefits to the current members and the buyer demonstrate that the sale price is not fair to the unsecured claimants who are not receiving any benefit from the sale.

**E.     There is no emergency or sound business reason which justifies a pre-confirmation sale.**

The Debtor has not offered a compelling business reason to make this sale outside a plan of reorganization.

The cash position of the company is sufficient to operate the business for several months. The Club's two post-petition operating reports show that the company is operating at a profit post-petition, despite the fact that the post-petition months are off-season for golf and foul weather has reduced rounds played. The operating reports show the company has a profit of $30,000 post-petition – a profit of $46,581 in December and loss of $16,268 in January. In both months, the Debtor significantly outperformed its own projections. According to the January report, the Debtors receivables are roughly twice the amount of payables. All post-petition bills have been paid. Apparently, the company has not received or used had to use any of the $80,000 in post-petition approved financing. In sum, the Debtor's claim that it must sell or close its doors is belied by its own financial statements.

Moreover, the Debtor has made no showing that the course is significantly more valuable as a "going concern." Nor has the Debtor presented any evidence that a temporary closing of the course, even if necessary, would significantly decrease the value of the assets.

The Debtor's real motivation is not the "emergency" but the fear that the Club will be sold to an owner who will not continue the "formidable benefits" that McConnell has promised. The board made reference to these "formidable benefits" when it warned the members that "the Club *might* be sold to another operator on certain terms that might be very different from some proposed

by [McConnell], for example, as a public golf course." The members main purpose is to cut off the objections of the dissenting class of claimants. The Debtor made this clear in its statement to members in October of last year, when the board stated, "We must sell the Club but cannot do so until we have satisfactorily disposed of the complaint."

**IV.    Objection to Debtor's Motion to Assume and Assign Executory Contracts**

The Debtor has moved to assume and assign several executory contracts incident to the sale of assets. In the event that the Court denies the Debtor's motion to sell assets, the Motion to assume and assign should be denied in whole. The contracts are being assumed to assign them to the proposed buyer in the sale under section 363. If the sale motion is denied, then the business justification for the assumption vanishes. Another buyer might not want to be saddled with these contracts, and assumption is not appropriate at this time.

The Debtor also moves to assume a promissory note to Plantation Federal Bank dated June 3, 2009. This is not an executory contract subject to assumption under section 365. Rather, the Note to Plantation Federal is simply an unsecured pre-petition claim, which should not be given preference by assumption by the Debtor. The Court should not approve the assumption of a promissory note as an executory contract.

**V.    Conclusion**

The Debtor's proposed sale would subvert the requirements of the bankruptcy code, and allow current members/owners to obtain significant benefits at the cost of the unsecured creditors. The Debtor's motions should be denied.

**THE CULVER FIRM, P.C.**

/s/ Robert E. Culver,
Robert E. Culver, Esq.
Fed. Id. No.: 7289
575 King Street, Ste. A
Charleston, SC 29403
Email: bob@culverlaw.net
Phone: 843-853-9816
Facsimile: 843-853-9838

Counsel for the Official Committee
of Unsecured Creditors for The Reserve Golf
Course of Pawleys Island, LLC[1]

March 1, 2009

---

[1] The committee motion to approve the hiring of counsel is pending before the court.

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE:<br><br>The Reserve Club of Pawleys Island, LLC.,<br><br>　　　　　　　　　　　　Debtor. | Case No. 09-09116-jw<br>Chapter 11<br><br>**CERTIFICATE OF SERVICE** |

  I, Linda A. Emanuele, Paralegal to Robert E. Culver, of The Culver Firm, P.C., Counsel for the Unsecured Creditors Committee, in the above-captioned matter, do hereby certify that I have on 1st day of March, 2010, via United States Postal Service, prepaid with the proper postage affixed, mailed a copy of *The Official Committee of the Unsecured Creditor's Objection to Debtor's Motion for Order Authorizing: (1) The Sale of Assets of the Debtor Free and Clear of Certain Liens, Claims, Encumbrances, and other interests pursuant to 11 U.S.C. §363, and (2) Authorizing the Assumption and Assignment of Certain Executory Contracts Pursuant to 11 U.S.C. §365* to the following identified on the Attached List:

                /s/ Linda A. Emanuele
                Paralegal to

                Robert E. Culver, Esq.
                Fed. Id. No.: 7289
                The Culver Firm, P.C.
                575 King Street, Ste. A
                Charleston, SC 29403
                Email: bob@culverlaw.net
                Phone: 843-853-9816
                Facsimile: 843-853-9838

Unsecured Creditors Committee and Notice Requests (as of March 1, 2010)
In Re:  Reserve Golf Club of Pawleys Island, LLC
Bankruptcy Case No.:  09-09116-jw

*The Official Committee of the Unsecured Creditor's Objection to
Debtor's Motion for Order Authorizing:
(1) The Sale of Assets of the Debtor Free and Clear of Certain Liens,
Claims, Encumbrances, and other Interests Pursuant to 11 U.S.C. §363,
and  (2) Authorizing the Assumption and Assignment of Certain Executory Contracts
Pursuant to 11 U.S.C. §365*

J. Edward Norris, III, President
Plantation Federal Bank
11039 Ocean Highway
Pawleys Island, South Carolina 29585

Z. S. Lawhon
Post Office Box 9279
Hickory, North Carolina 28603

Randy E. Eckard
114Coleman Court
Pawleys Island, South Carolina 29585

Frank Stiglin
75 Glenegle Lane
Pawleys Island, South Carolina 29585-6750

Joseph R. Bilotta
973 Doral Drive
Pawleys Island, South Carolina 29585-6761

Joseph J. Seliga
16328 Cutters Court
Fort Myers, Florida 33908-3094

John L. Dyer
2360 Eisenhower Avenue
Watkinsville, Georgia 30677

John R. Hussey
107 Oakview Circle
Manning, South Carolina 29102

Carolyn D. Gardner
14 Historic Lane
Pawleys Island, South Carolina 29585

Conrad I. Kohler
205 Berwick Drive
Pawleys Island, South Carolina 29585

Alan L. England
77 St. Anne's Place
Pawleys Island, South Carolina 29585

Michael F. Sacco
Post Office Box 1230
Pawleys Island, South Carolina 29585-1230

Joseph F. Buzhardt, III
Office of the United States Trustee
1835 Assembly Street Suite 953
Columbia, South Carolina  29201

Suzanne Taylor Graham Grigg, Esq.
Nexsen Pruet, LLC
PO Drawer 2426
Columbia, South Carolina  29202

J. Ronald Jones, Jr., Esq.
126 Seven Farms Drive
Suite 200
Charleston, South Carolina  29492-7595

William McCarthy, Esq.
Daniel J. Reynolds, Jr., Esq.
McCarthy Law Firm, LLC
1715 Pickens St. (29201)
PO Box 11332
Columbia, SC 29211-1332

Reserve Golf Club of Pawleys Island, LLC
18 Reserve Drive
Pawleys Island, South Carolina 29585

The Reserve Golf Club Acquisition, LLC
400 Donald Ross Drive
Raleigh, North Carolina 27610
Attention of John McConnell

Wyrick Robbins Yates and Ponton LLP
4101 Lake Boone Trail, Suite 300
Raleigh, North Carolina 27607
Attention of Larry E. Robbins