**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number: **09-09116-jw**

**ORDER**

The relief set forth on the following pages, for a total of 12 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**03/23/2010**



*John E Waites*

Chief US Bankruptcy Court Judge
District of South Carolina

Entered: 03/23/2010

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| IN RE:<br><br>Reserve Golf Club of Pawleys Island, LLC,<br><br>Debtor(s). | C/A No. 09-09116-JW<br><br>Chapter 11<br><br>**ORDER** |
|---|---|

    This matter comes before the Court upon the Motion for Order Authorizing: (1) the Sale of Assets of the Debtor Free and Clear of Certain Liens, Claims, Encumbrances, and Other Interests Pursuant to 11 U.S.C. § 363; and (2) Authorizing the Assumption and Assignment of Certain Executory Contracts Pursuant to 11 U.S.C. § 365 and Addendum/Amendment thereto (collectively, the "Motion") filed by Reserve Golf Club of Pawley's Island, LLC ("Debtor" or the "Club"). The Reserve at Litchfield Community Association, Inc. ("Community Association") filed responses in support of the Motion, and the Official Committee of the Unsecured Creditors ("Committee") filed an objection.[1] This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1334, and it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Pursuant to Rule 52, Fed. R. Civ. P., made applicable to this proceeding by Rules 7052 and 9014, Fed. R. Bankr. P., the Court makes the following Findings of Fact and Conclusions of Law.[2]

## FINDINGS OF FACT

    1.    The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 4, 2009, and is currently operating its business and managing its

---

[1] A limited objection was also filed by the Litchfield Company of South Carolina Limited Partnership (the "Litchfield Company"); however, this objection was subsequently withdrawn.

[2] To the extent that any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

1

assets as a debtor in possession pursuant to §§ 1107(a) and 1108.

2. The Debtor was formed in 2006 when it purchased the existing Reserve Golf Club in Georgetown County, South Carolina from the Litchfield Company, with membership consisting of both equity members and non-equity members.

3. The Debtor operates the member-owned private golf course, with approximately 31 employees and 473 total active, active resigned, and inactive resigned members. Pursuant to the Debtor's schedules, the assets of the Club include approximately 325 acres with a value of $750,000 and personal property with a value of $409,343.91.

4. At the time the Debtor purchased the Club from the Litchfield Company, a membership plan describing the rights and privileges of the members was in place ("Litchfield Membership Plan"). Pursuant to the Third Amendment to the Litchfield Membership Plan, the Debtor acquired the club facilities subject to the membership plan. The Debtor also issued a new but substantially similar membership plan, dated July 26, 2007.[3]

5. The membership plan provides: "If approved for membership at [the Club], the member agrees to be bound by the terms and conditions of the Membership Plan, as it may be amended from time to time . . . ."

6. Pursuant to the membership plan, different classifications of membership are available to prospective club members. Club members may resign their membership privileges with sixty days prior notice of their intention to resign given to the Club. Members who have effectively resigned their privileges and have no outstanding dues, fees, and charges are placed on a resigned membership list for their membership classification on a first-come, first-served

---

[3] There has been some debate between the parties as to which membership plan applies. Because the few differences between the membership plans do not affect the outcome of this matter, the Court need not decide which version of the membership plan controls and will consider the version relied upon by the Committee. Thus, the Court's further references to the membership plan, except where otherwise stated, will be to the Litchfield Membership Plan and the amendments thereto.

basis. The resigned membership that has rotated to the top of each resigned membership list is entitled to repayment of the "Transfer Payment" applicable for that membership classification upon the issuance of every fourth membership of that classification by the Club.[4]

7. The membership plan provides the following definition and terms for the Transfer Payment:

> Upon the resignation of a Club Membership . . . the Club shall repay the Transfer Payment to the resigned member within thirty days after the resigned membership is reissued by the Club to a successor member who has been approved for membership and paid the required membership fee to the Club. The amount of the Transfer Payment shall be based on the particular classification of membership held by the resigned member. Unless otherwise set forth in the member's Application for Club Membership Privileges, the Transfer Payment for Reserve Memberships shall be equal to ninety percent of the actual membership fee previously paid to the Club by the resigned Reserve Member, and the Transfer Payment for Golf Memberships shall be equal to eighty percent of the actual membership fee previously paid to the Club by the resigned Golf Member.[5]
>
> In order for a resigned member to be paid the Transfer Payment, the resigned member must have paid the required membership fee and all outstanding dues, fees and charges in full.
>
> . . . .
>
> Members who have resigned membership privileges at [the Club] shall be obligated to pay dues, fees and other charges associated with the resigned membership until the earlier of: (i) reissuance of the resigned membership by the Club, or (ii) ten

---

[4] The requirement of four new memberships is applicable until all available memberships for a certain classification have been issued, at which point a Transfer Payment to the resigned member at the top of each list is dependent upon the issuance of one new membership of that classification. It is apparent that not all available memberships have been issued, and consequently, the person at the top of each resignation list is not entitled to receive the Transfer Payment until four new memberships for that classification have been issued.

[5] The new membership plan also includes a provision for members with an equity interest, stating that owner-members may redeem their ownership share for $5,000 upon an effective resignation. When an owner-member's name rotates to the top of a separate resigned owner-member redemption list, the resigned owner-member is entitled to the redemption payment upon the admission to membership of a new owner-member. However, counsel for both parties have indicated the equity members' rights to redemption payments is not pertinent to this Motion or the Committee's objection.

3

months after the date resignation of membership privileges is effective.

8. The membership plan provides the Club with the right to unilaterally change the terms of repayment of membership fees for future memberships:

> The Club reserves the right to change the amount of the membership fee to be repaid and the terms of repayment for the membership fee for unissued memberships at [the Club] including the reissuance of resigned memberships. Any such change will not affect, in any way, the members at [the Club] who have obtained a membership prior to the time the change takes effect.

9. The membership plan provides further terms by which the membership plan may be modified or terminated:

> Changes to the [membership plan] which the Club deems materially adverse to the privileges of the Club Members include: (i) changing the basis by which existing Club Memberships are reissued by the Club and resigned members are repaid the Transfer Payment as further set forth herein . . . . Any amendments or changes that are materially adverse to the privileges of the Club Members shall not be made unless approved by two-thirds of the outstanding Club Memberships that are affected by the proposed change. Each Club Member who is affected by the proposed modification shall have one vote per membership. All members agree to be bound by any changes to this Membership Plan.[6]

10. The membership plan also provides the Club with the right to terminate the membership plan, terminate all memberships, or to sell or otherwise dispose of the Club:

> In the event the Membership Plan or any particular membership is terminated without cause, the affected member(s) will be repaid one hundred percent of the actual membership fee previously paid to the Club, without interest.

11. In the Motion, Debtor asks the Court to approve the terms of a proposed sale of substantially all of the Debtor's assets, inventory, equipment, real property and rights relating

---

[6] The terms of the new membership plan are substantially similar with the exception that any amendment which is materially adverse would need to be approved by two-thirds of only the active and active resigned club memberships that are affected by the proposed change.

4

thereto to The Reserve Golf Club Acquisition, LLC, a wholly owned subsidiary of McConnell Golf, LLC ("Buyer") for a purchase price of approximately $522,705, plus a commitment to infuse significant new capital to fund capital improvements, to offset negative cash flow from Club operations, and to maintain the Club as a private facility.[7]

12. Pursuant to the Motion, the purchase price includes: (1) $1 in cash paid by the Buyer to Debtor; (2) $66,250 to be contributed by certain Club Members and the Community Association members on behalf of the Buyer for the settlement of the claims of the dissident members; and (3) up to the remaining amount for assumed/paid liabilities (including all estimated tax and trade payable obligations, the unsecured Plantation Federal Bank ("Plantation") line of credit, the estimated approximated lease balances, and up to $80,000 for post-petition financing from Plantation). Over the next four years, the Buyer will contribute an aggregate amount of at least $2 million to (1) satisfy the assumed obligations; (2) fund negative cash flow from Club operations; and (3) fund capital improvements including renovation/construction related to the golf course and other Club facilities.

13. Debtor provides that as of December 31, 2009, it had approximately $195,528 in unsecured tax and trade payables, an unsecured line of credit outstanding to Plantation in the amount of $55,000, and lease agreements with secured lenders with approximate lease balances of $125,926 (the "lease agreements"). Additionally, the Debtor has approval for post-petition financing up to an additional $80,000 from Plantation secured by a mortgage on Debtor's real

---

[7] As part of its Motion, Debtor seeks approval of a sale free and clear of the Lis Pendens placed on the real property in connection with the litigation commenced in May 2009 by four resigned members of the Club, on behalf of a class of former members, with the primary objective of preventing the proposed sale of the Club unless the former members first receive reimbursement of a portion of the initiation fees.

5

property.[8]

14. Debtor proposes that upon the sale closing, substantially all of Debtor's tax and trade creditors will have their liabilities either assumed or paid in full, and the remaining claimants will be dissident members whose claims will be dealt with through a plan of reorganization.[9] Furthermore, under the terms of the sale, Buyer will assume all trade and tax accounts payable and accrued liabilities, including the debts to Plantation, the lease agreements, obligations to the Community Association for unpaid dues, and outstanding real property taxes.

15. In October 2009, the Board of Managers for the Debtor sent correspondence to all refundable members and shareowners and conducted a vote regarding the proposed sale and amendment to the membership plan. The members and shareowners were presented with the following proposition:[10]

> **PROPOSITION #1**: Voting By Shareowners (1 Vote Per Share), By All Refundable Dues-Paying Active and Active Resigned Club members (1 Vote Per Membership) and By All Refundable Inactive Resigned former Club members (1 Vote Per Membership). Approval requires the affirmative vote of 2/3 of all shareowners and 2/3 of all Refundable [Active + Active Resigned + Inactive Resigned former] members. Votes may be cast only by the shareowner, member or former member of record. Only the votes of voting eligible refundable members or former members will have force and effect with respect to Part 1 of Proposition #1, below. Only the votes of voting eligible shareowners will have

---

[8] The only secured creditor listed on Debtor's schedules was the Litchfield Company, who had an indemnification mortgage on the all of Debtor's real property. However, the mortgage expired by its own terms on February 28, 2010, and as previously noted, the Litchfield Company has no outstanding objection to the Motion.

[9] As part of the Debtor's Chapter 11 Plan of Reorganization (the "Plan"), the Debtor includes as one unimpaired class all active, active resigned, and inactive resigned members of the Club, who are "creditors by virtue of prepaid membership fees and initiation fees." In connection with the proposed sale, the Plan provides that all memberships of the Club would be terminated, but that the Buyer agrees "to give members and former members of the [Club] the option of becoming members of the New Club, provided these members and former members satisfy any and all outstanding fees and dues owed to the Debtor, and further provided that they have not already received a refund of their initiation fees." Former members who decline membership in the New Club are entitled to a share of $66,250.

[10] The following language was presented to the Court after the hearing upon the agreement of the parties.

6

> force and effect with respect to Part 2 of Proposition #1, below.
>
> To sell the assets of the Club to the [Buyer] per the terms offered and, in so doing, to
>
> 1. Amend and restate in its entirety the Plan for the Offering of Memberships and thereby eliminate entirely any refund of initiation fees; and
> 2. Permanently extinguish the right of any shareowner to the redemption of his or her equity contribution of $5,000 (only shareowner votes on this aspect of the proposition will have force and effect).

16. Out of 437 active, active resigned, and inactive members eligible to vote, 308 members, or 70.48%, voted "yes." Out of 341 active and active resigned members eligible to vote, 289 members, or 84.75%, voted "yes."[11] Under either version of the membership plan, as well as the terms for the voting process outlined in the correspondence sent to the members, the vote passed by the requisite two-thirds majority.[12] Pursuant to the membership plan, all members agree to be bound by any changes to the membership plan.

### **CONCLUSIONS OF LAW**

Debtor seeks authorization for the proposed pre-confirmation sale under 11 U.S.C. § 363(b)(1) as a sale not made in the ordinary course of business, and to convey the property free and clear of certain liens, claims, encumbrances, and other interests pursuant to § 363(f). Debtor asserts that the pre-confirmation sale is necessary based on the economic needs of the property in the future and the insufficiency of funds to continue operations due to the declining membership, and has expressed its desire that the Club be maintained as a private course. Debtor also seeks approval for the sale free and clear of the lis pendens placed on the property by the former

---

[11] A further breakdown of the former members' voting results is as follows: out of 38 eligible active resigned members, 22 members, or 57.89%, voted affirmatively; and out of 96 eligible inactive resigned members, 19 members, or 19.79%, voted affirmatively.

[12] Additionally, out of 341 shareowners eligible to vote, 295, or 86.51%, voted affirmatively to extinguish the redemption rights of the shareowners.

7

members. This Court has recognized that a pre-confirmation sale may be appropriate when a sound business purpose exists. In re Taylor, 198 B.R. 142, 156-57 (Bankr. D.S.C. 1996).

After reviewing the pleadings, exhibits, memoranda, and documents submitted by stipulation, and considering the parties' arguments made at the hearing, the Court overrules the Committee's objection and grants the Motion. Initially, the Court finds that the Committee's objection presents an issue of standing that must be addressed. The points of contention between the Club and the Committee appear to focus on two issues: (1) whether the Club may make changes to existing members' rights to repayment; and (2) if changes may be made, whether the Club obtained the requisite two-thirds approval by affected members in the October vote to extinguish members' rights to a refund of initiation fees.

"When a contract is unambiguous, clear and explicit, it must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary and popular sense." C.A.N. Enters., Inc. v. S.C. Health & Human Servs., 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988). In construing a contract, "it is proper to read together the different provisions therein dealing with the same subject matter, and where possible, all the language used should be given a reasonable meaning." Ecclesiastes Prod. Ministries v. Outparcel Assocs., LLC, 374 S.C. 483, 498-99, 649 S.E.2d 494, 502 (Ct. App. 2007) (quoting Brady v. Brady, 222 S.C. 242, 72 S.E.2d 193 (1952)).

The Committee points to the provision of the membership plan pertaining to the Club's right to change the terms of repayment for membership fees for unissued memberships to assert the argument that no changes could be made to existing club memberships. The Court agrees with the Club, however, that this provision expressly provides the Club with a *unilateral right* to modify the amounts of membership fees to be repaid and the terms of repayment. In contrast,

8

the membership plan also provides that changes may be made regarding the reissuance of club memberships and repayment of membership fees to *existing* club memberships if, according to the Litchfield Membership Plan, two-thirds of outstanding memberships affected by the change vote to approve the proposed modification. Reading the two provisions in conjunction, the Club may make prospective changes unilaterally to the issuance of refunds for new memberships, but changes in the refunding of fees may be made to existing memberships only upon the approval of two-thirds of the members.

As outlined above, the Club utilized the voting process provided for in the membership plan for the approval and implementation of a change to the repayment of membership fees. Part One of the proposition presented to the members was to sell the Club assets, and in so doing, to eliminate any refund of initiation fees. The proposition stated that approval of the proposition required the affirmative vote of two-thirds of all refundable active, active resigned, and inactive resigned members. The Committee disputes the Club's assertion that the requisite approval was obtained on the basis that not all members were "affected," and thus, the active members' votes should not have been considered in conjunction with the former members' votes.

While the Court acknowledges that the active and former members may have differing interests regarding the future of the Club, the Court cannot agree with the Committee's argument that all members were not affected by the proposition. Prior to the October vote, the current members faced the possibility of a termination of their membership without cause if the Club was forced to shut down, which would entitle them to a refund of their membership fees. Additionally, prior to the vote, the current members were also entitled to resign, which would have given them the same entitlement to a refund conditioned upon the issuance of new memberships.

9

With respect to the prospect of actually receiving a refund of membership fees due to a sale of the property at the time of the October vote, the dissident members' position was not superior to that of the active members. There is no evidence that there were any dissident members with a present entitlement to a refund at the time of the October vote or the December petition filing.[13] As provided for in the membership agreement, a refund to a resigned member is dependent upon the issuance of four new memberships of that resigned member's membership classification. According to the evidence presented, the last new member joined in June 2009, there are no prospective memberships pending, and it appears unlikely that the Debtor can attract any new members under the current circumstances. Thus, although the active and former members may have different intentions concerning their involvement in the new club to be established by the proposed Buyer, all refundable members were affected, as that term is to be commonly understood, by the proposition to extinguish the issuance of refunds.

Based on the voting results of the affected members, which includes all refundable active, active resigned, and resigned members, the proposition received the requisite two-thirds approval. Pursuant to the membership plan, members agreed to be bound by any changes to the membership plan which were made in accordance with the terms governing modifications. The former members represented by the Committee were informed of and given the opportunity to participate in the vote on the modification, and therefore, appear to be bound to the results of the October vote approving the sale of the Debtor's assets and extinguishing the claims of all members to a refund of initiation fees. Thus, while the Committee members' interests may have

---

[13] The Appointment of Committee of Unsecured Creditors lists Frank Stiglin, Michael F. Sacco, J. Edward Norris, III, President of Plantation Federal Bank, and Conrad Kohler as the members of the Committee. According to the resignation lists attached to the Committee's memorandum, Stiglin is number 60, Sacco is number 43, and Kohler is number 14 in order of priority on the Reserve Membership Resignation List. Therefore, the Club would need to issue fifty-six new Reserve memberships for the first Committee member to be eligible to receive a refund.

been essentially valueless prior to the October vote, the vote itself served to extinguish any interest they might have had. Since the former members who make up the Committee do not have a pecuniary interest, the Court cannot treat the Committee as a party in interest for purposes of considering the proposed sale. See Grausz v. Englander, 321 F.3d 467, 473 (4th Cir. 2003) (stating that "[i]n the bankruptcy context a party in interest is one who has a pecuniary interest in the distribution of assets to creditors"); In re LeBlanc Inc., 299 B.R. 546, 551 (Bankr. N.D. Iowa 2003) (finding that because a non-creditor party had no pecuniary interest in the sale, it did not have standing to object to the sale).

Accordingly, the Court concludes that it need not consider the objection of the Committee in evaluating the proposed sale. Because there are no objections to consider and all other parties in interest support the sale, the Court will consider the Taylor factors to be satisfied and finds that the proposed sale should be approved.[14] In light of the Court's determination as to the proposed sale and because there are no outstanding objections to the Debtor's request to assume and assign certain executory contracts pursuant to § 365, the Court grants that request as well.

Based on the foregoing analysis, the Motion is granted.[15]

**AND IT IS SO ORDERED.**

Columbia, South Carolina
March 23, 2010

---

[14] Absent this determination, and the resulting lack of objections, the Court would have concerns regarding a pre-confirmation sale in this case. It appears that even without drawing on the previously approved loan of $80,000, the Debtor has funds available and is generating sufficient revenues to operate until a sale by plan could be approved. The proposed purchase price appears significantly less than the scheduled value of the assets. In addition, the evidence raises questions regarding the appropriateness of such a significant expense reimbursement fee for the Buyer considering its longstanding interest in the purchase from Debtor, which thereby raises a question regarding whether the fee was intended to discourage other bidders. However, these concerns are outweighed in this case where all constituents appear to be in agreement with the sale and likely to accept the pending Chapter 11 Plan.

[15] The Court may issue a supplemental order to provide details or other provisions regarding the sale or the Motion that would assist in the closing of the sale.