# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| The Reserve Golf Club of Pawleys Island LLC | ) | Case No. 09-09116-jw |
| | ) | |
| Debtor. | ) | |

## AMENDED DISCLOSURE STATEMENT

Filed by the Debtor-in-Possession on April 1, 2010

### Table of Contents

| | | Page |
|---|---|---|
| I. | Introduction | 2 |
| II. | History and Events Leading to Bankruptcy | 3 |
| III. | Post-Petition Activity | 4 |
| IV. | Property of the Debtor | 6 |
| V. | Proposed Sale | 6 |
| VI. | Summary of Proposed Plan | 8 |
| VII. | Liquidation Analysis | 14 |
| VIII. | Feasibility of Plan | 16 |
| IX. | Tax Consequences | 17 |
| X. | Conclusion | 17 |

# DISCLOSURE STATEMENT

## I.    INTRODUCTION

The Reserve Golf Club of Pawleys Island LLC (the "Debtor") provides this Disclosure Statement to all of its known creditors and parties in interest in order to disclose information considered by the Debtor to be important, material and necessary for the creditors to make a reasonably informed decision in exercising their right to vote on the Amended Plan of Reorganization of the Debtor (the "Plan") which has been summarized herein and will be filed with this Amended Disclosure Statement (the "Disclosure Statement") in the United States Bankruptcy Court for the District of South Carolina.  This Disclosure Statement must provide such information, as far as practicable, that would enable a hypothetical reasonable investor typical of the holders of claims against the Debtor, to make an informed judgment about the Plan.  The Debtor feels that the information provided in this Disclosure Statement gives information which is adequate for an investor to make such a decision.  The United States Bankruptcy Court will set a hearing to determine if this Disclosure Statement provides adequate information and conforms to the requirements of the Bankruptcy Code  (11 U.S.C. §101 et seq.).

The United States Bankruptcy Court will set a date at a later time for a hearing on the acceptance of the Plan or may combine the Disclosure Statement and Plan hearing.  Notice of the hearing will be mailed to all holders of claims, and upon receiving the Notice of Hearing, holders of claims may vote on the Plan by completing the ballot mailed with the Plan and Notice of Hearing and then returning the ballot to the Bankruptcy Court.  The Notice of Hearing will specify a time within which the ballots must be returned.  The vote of all creditors and holders of claims is very important.  The Plan will be confirmed by the Court if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the creditors or holders of claims in each class voting on the Plan, and two-thirds (2/3) in number of the holders of allowed interests voting on the Plan.  In the event the requisite number of acceptances is not obtained, the Court may still confirm the Plan if the Court finds the Plan accords fair and equitable treatment to those classes rejecting the Plan.

The Debtor reserves the right to object to any claim prior to the closing of the case.  The Debtor also reserves its right to bring any potential avoidance actions pursuant to 11 U.S.C. §§ 547, 548, 549, and 550.

The Plan represents a legally binding arrangement and should be read in its entirety,

rather than relying on the summary in this Disclosure Statement. Approval of the Disclosure Statement by the United States Bankruptcy Court does not constitute approval by the Bankruptcy Court on the merits of the Plan.

EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR AND HAS BEEN PREPARED BASED ON INFORMATION AVAILABLE TO THE DEBTOR. NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY THE VALUE OF THE ASSETS OF THE DEBTOR) ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.

## II.    HISTORY OF THE DEBTOR AND EVENTS LEADING TO THE FILING OF BANKRUPTCY

The Debtor is a South Carolina Limited Liability Company based in Pawleys Island, SC with approximately 31 employees. Debtor operates a member-owned private golf course serving approximately 473 active and inactive former members.

The Debtor was founded in 2006 by purchasing the existing Reserve Golf Club from the Litchfield Company. Equity members each contributed $5,000 for one share in the Debtor. From 2006 through 2008, the Debtor generally operated as projected. In 2008, the Debtor suffered a downturn. As with many golf course operators, Debtor's gross revenues, coming in the form of initiation fees, dues, usage fees, food and beverage and pro shop sales sharply declined. Members began resigning at an increasing rate without the customarily corresponding initiation of new members. Membership rolls decreased below a subsistence level from June 2008 through December 2009.

Debtor's Board of Managers explored various alternative financing methods. One such solution was to assess the current membership, but that proposal was voted down by the members and shareowners, as were other solutions proposed to the membership. Additionally, in light of the already high levels of dues and fees of the Debtor within the relevant market, further increases in dues and fees were anticipated to encourage further resignations based upon significant feedback from the Club's members. The one possible method of financing deemed viable for the continuation of the course and the club was a sale of the Club in the form of a sale of substantially all assets of the Debtor.

The sale process encountered a challenge due to pending litigation against the Debtor. Litigation was commenced in May 2009 by four (4) resigned members of the Club, on behalf of a class of allegedly similarly situated former members (taken collectively, the "Dissidents"), with the central objective of preventing the sale of the Club, unless said former members were first reimbursed a portion of the initiation fees which they paid to join the Club. In contemplating the proposed sale of the Club, the members (including active, active-resigned, and resigned members) and shareowners voted in the affirmative in October 2009, pursuant to the requirements set forth in Debtor's Plan for the Offering of Memberships - the contract that controls the rights of the Debtor's Golf Club members, to approve the Debtor's proposed sale and in doing so to extinguish their rights to refunds of initiation fees and equity contributions conditioned. Such sale contemplates, among other things materially important to the Club's members and to surrounding property owners, a commitment to maintain the Club as a private facility.

Prepetition attempts to settle the litigation failed, and the Debtor concluded that its very limited capital would prevent it from continuing to pursue its defense of that action before it ran out of cash.

The Debtor continued to deplete cash reserves and risked falling behind on its secured and tax obligations, as well as being unable to invest in the costly land maintenance necessary to maintain its status as a going concern. Therefore, the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 4, 2009 to utilize the time afforded by 11 U.S.C. §362 to effectuate a reorganization or sale of its business operations and to address the litigation in progress.

### III.   POST-PETITION ACTIVITY
#### A.   Bankruptcy Filing and First Day Motions

The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 4, 2009. Since that time, the Debtor has managed its assets as a debtor in possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code.

On December 8, 2009, the Debtor filed an emergency motion for an order under 11 U.S.C. Section 105(a), 363(b) and 507(a) authorizing the payment of employee wages, benefits and equipment insurance premiums. The Debtor proposed to pay certain necessary prepetition wage and insurance claims in order to ensure the continuing viability of the business, retain

4

employees and protect equipment serving as collateral. A hearing was held on the motion on December 16, 2009, and the Court entered an order authorizing the payment of these prepetition claims on December 17, 2009.

On December 8, 2009, the Debtor filed an emergency motion for an order under 11 U.S.C. Section 366 authorizing the payment of adequate assurance to utility providers. The Debtor proposed to provide prepayments to utility providers as adequate assurance of payment in order to continue its use of utility services. A hearing was held on the motion on December 16, 2009, and the Court entered an order authorizing the payment of adequate assurance to utilities on December 17, 2009.

On December 8, 2009, the Debtor filed an emergency motion for an order under 11 U.S.C. Section 364(c)(2) in addition to Bankruptcy Rules 4001 and 9014 requesting the authorization of Debtor-In-Possession ("DIP") Financing. The Debtor proposed to utilize a loan granted by Plantation Federal Bank ("Plantation"), secured by a junior lien against all of Debtor's real property, to ensure payment of post-petition operating expenses. A hearing was held on the motion on December 16, 2009. The Court assessed the length of time before such financing was projected to be utilized and rescheduled the hearing on the DIP motion to January 13, 2010. A second hearing was held on the motion on January 13, 2010, and the Court entered an order authorizing the postpetition loan from Plantation to Debtor on January 19, 2010.

### B.    Sale of Assets

On January 21, 2010, the Debtor filed a motion for an order authorizing the sale of its assets free and clear of all liens, claims, encumbrances, and other interests pursuant to 11 U.S.C. §363 to The Reserve Golf Club Acquisition LLC, a wholly-owned subsidiary of McConnell Golf, LLC ("McConnell") for a purchase price of approximately $522,705 in paid or assumed liabilities plus a commitment to infuse approximately $1.48 Million to fund capital improvements and to offset negative cash flow from Club operations over the next four (4) years as more fully described in the Debtor's Sale Motion. On January 21, 2010, the Debtor filed its motion to approve the sale of its assets and also filed a bid procedures motion. The Court entered a bid procedures order and set the Sale Motion for final hearing on March 10, 2010. Details of the proposed sale are set forth in more detail below.

The appointed Official Committee of Unsecured Creditors (the "Committee") in this matter objected to the Debtor's proposed sale, and on March 10 and 11, 2010, the Court

conducted hearings on the proposed McConnell sale, as no qualified competitive bids were received prior to the March 5, 2010 bidding deadline. The Committee in this matter is predominantly made up of inactive club members asserting that they are owed initiation fee refunds from the Debtor. Subsequent to the Sale Hearing, the Court took the matter under advisement, and on March 15, 2010, the Committee filed a Motion to Alter or Vacate the bid procedures order seeking, among other things, to re-open and extend bidding to allow further opportunities for others to bid on the Assets.

On March 23, 2010, the Court entered an order approving the Debtor's proposed sale to McConnell, finding that the rights of dissident members to initiation fee refunds were extinguished as a result of the October 2009 membership vote discussed above and further finding that the Committee had no pecuniary interest in the Debtor's estate and no standing to object to the Sale.

### C. Leases

Included in the Debtor's sale motion, filed January 21, 2010 and amended February 17, 2010, was the Debtor's request to assume certain leases and assign them to its proposed purchaser. The Court's March 23, 2010 Order Approving Sale approved the assumption and assignment of the Debtor's leases to its purchaser.

## IV. PROPERTY OF THE DEBTOR

Debtor's assets consist primarily of cash, receivables, maintenance equipment and land. Land includes the 18-hole golf course, the clubhouse and other outbuildings, and is covenanted for no use other than a golf facility until 2056.

The Debtor is in the process of reviewing its financial records with regard to whether the Debtor has any causes of action pursuant to 11 U.S.C. §§ 547, 548, 549, and 550. At this time, the Debtor is not aware of any such actions.

As set forth herein below, the Debtor has been granted authority and intends to sell substantially all of its assets to the McConnell Golf entity described above.

## V. PROPOSED SALE OF THE PROPERTY

On October 13, 2009, the Debtor and McConnell entered into an Asset Purchase Agreement for the Purchase of substantially all of the Debtor's Assets (said agreement shall hereinafter be referred to as the "Sale Agreement"). The Debtor filed its voluntary petition for

relief under Chapter 11 of the Bankruptcy Code on December 4, 2009.  The Debtor filed its Sale Motion on January 21, 2010 and filed an Addendum to its Sale Motion on February 18, 2010.  A final hearing on the approval of the Sale Agreement was held on March 10 and March 11, 2010, and the Court entered its order approving the Sale on March 23, 2010.  The sale is tentatively set for closing on April 7, 2010.

Pursuant to the Sale Agreement, McConnell has offered to assume obligations, which aggregate to approximately $522,705.00, and to infuse significant new capital of approximately $1.48 Million to fund capital improvements and to offset negative cash flow from Club operations over the next four (4) years ("Purchase Price") in return for the receipt of the Debtor's real and personal property (collectively hereinafter referred to as the "Assets").  The approximate $522,705.00 assumption part of the Purchase Price is calculated as follows:

| | |
|---|---|
| Cash Paid to Seller | 1.00 |
| Assumption of Plantation Federal Line of Credit | 80,000.00 |
| Assumption of leases and other liabilities | 376,454.00 |
| Funds initially contributed by Golf Club and HOA Members to Settle Dissident Member Claims | 66,250.00 |

Key assets being transferred include the Debtor's cash, receivables, equipment, and real property.  Specifically not included in the Sale Agreement are any potential avoidance actions pursuant to 11 U.S.C. §§ 547, 548, 549, and 550.

At closing, Debtor's leases will be assumed and debts will be paid and assumed as set forth in Article VI below.  Thereafter, except as otherwise provided, creditors in classes 2-12 will be paid in full at closing or enjoy an assumption of debt in full by McConnell as set forth in Article VI.

Included in the estimated $522,000 portion of the Purchase Price is an escrow account held in trust by third-party counsel (the "Escrow"), containing $66,250 that were donations from the Debtor's golf club members and homeowners within the Reserve community.  Pursuant to the Escrow agreement, these funds were initially included as an additional part of the McConnell Purchase Price and earmarked for a settlement of the dissident member claims upon completion of the Debtor's proposed sale to McConnell.  The funds in that Escrow were specifically not to be used for any other purpose and, in the event of a sale to another bidder or no sale at all, were to be returned to the donors.

Contrary to the Debtor's initial unconfirmed Plan of Reorganization filed on March 5,

2010, this Amended Disclosure Statement and the accompanying Amended Plan call for the return of all of the Escrow fund to the donors of such fund based upon the Dissident members' refusal to settle, repeated post-petition attempts to block and delay the Debtor's Sale to McConnell, and the Court's findings in the Order Approving Sale that the asserted claims of the dissident members were extinguished as a result of the October 2009 vote of the Debtor's members.

All secured and unsecured trade payables will be assumed by McConnell. The Debtor anticipates no remaining sales proceeds and cash on hand available for distribution to the unsecured creditors of the estate.

## VI.   SUMMARY OF PROPOSED PLAN

Debtor's Plan is a liquidating plan and the allowed claims of creditors will be paid as described herein below and in the Plan. The Debtor's Plan calls for the sale of substantially all of its assets and distribution of the sales proceeds to creditors as set out in the classifications below.

Class 1.    Litchfield Crossing Development Company, LLC.    Secured, unimpaired. The Litchfield Crossing Development Company, LLC ("Litchfield"). At time of filing, Litchfield held a first priority indemnification mortgage on all of the Debtor's real property. The indemnification mortgage was created as a part of Litchfield's transfer of the Golf Club to the Debtor on March 2, 2006. The purpose of the mortgage was to protect Litchfield for up to four years from any claims arising from Litchfield's failure to make certain improvements to structures on the Debtor's real property. At the time of filing, the debtor asserted that the Litchfield claim and indemnification mortgage had little to no value.

As of March 2, 2010, this indemnification mortgage expired by its own terms. Thus, Litchfield has no claim. Litchfield has no remaining mortgages, liens, encumbrances or other interests in or to any of the Debtor's real property.

Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate.

Class 2.    Plantation Federal Bank.    Partially Secured, unimpaired. Plantation Federal Bank ("Plantation") provided the Debtor with a prepetition line of credit drawn down to $55,000 and a postpetition line of credit (the "DIP loan") of up to $80,000, which will be or has

been drawn down in full to fund the Debtor's post-petition operations. The DIP loan is secured by a mortgage on all of debtor's real property. Plantation asserts a post-petition, secured claim in the approximate amount of $80,000.00 and a pre-petition unsecured claim of $55,000.

Plantation's debts, both prepetition and postpetition, are either being paid in full or assumed by McConnell at closing of the Sale. Upon closing, Plantation's debt will be assumed or repaid by McConnell in its entirety, and Plantation shall no longer have any claims against the Debtor or its estate. In the event that McConnell pays the DIP loan in full at closing, the sale to McConnell shall be free and clear of the Plantation mortgage. However, in the event that McConnell assumes the DIP loan rather than paying it in full at closing, Plantation's mortgage will remain on the real property transferred pursuant to the sale. Upon consummation of the sale, this debt will paid in full or assumed by the purchaser.

Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate.

Class 3.     Wells Fargo Financial Leasing.     Secured, unimpaired. Wells Fargo Financial Leasing ("WFFL") provided the Debtor with leases for heavy groundskeeping and course maintenance equipment, and WFFL asserts a lien on or ownership of the equipment and a claim in the approximate amount of $87,858.00 as of December 31, 2009.

As part of the proposed sale, McConnell will assume the equipment leases with WFFL in their entirety. To any extent these equipment leases constitute disguised security agreements on assets belonging to the Debtor, Buyer is purchasing such assets of WFFL subject to the existing liens, claims, and encumbrances of WFFL. Upon consummation of the sale, this debt will paid in full or assumed by the purchaser.

Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate.

Class 4.     GE Capital.     Secured, unimpaired. GE Capital ("GE") provided the Debtor with leases for golf carts, and GE asserts a lien on or ownership of the golf carts and a claim in the approximate amount of $30,920.00 as of December 31, 2009.

As part of the proposed sale, McConnell will assume the cart leases with GE in their entirety. To any extent these equipment leases constitute disguised security agreements on assets belonging to the Debtor, Buyer is purchasing such assets of GE subject to the existing liens, claims, and encumbrances of GE. Upon consummation of the sale, this debt will paid in full or

9

assumed by the purchaser.

Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate.

Class 5. **Ikon Financial Services.** Secured, unimpaired. Ikon Financial Services ("Ikon") provided the Debtor with leases for photocopiers and office machines, and Ikon asserts a lien on or ownership of those office machines and a claim in the approximate amount of $3,496.00 as of December 31, 2009.

As part of the proposed sale, McConnell will assume the leases with Ikon in their entirety. To any extent these equipment leases constitute disguised security agreements on assets belonging to the Debtor, Buyer is purchasing such assets of Ikon subject to the existing liens, claims, and encumbrances of Ikon. Upon consummation of the sale, this debt will paid in full or assumed by the purchaser.

Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate.

Class 6. **Auto Chlor Systems.** Secured, unimpaired. Auto Chlor Systems ("ACS") provided the Debtor with leases for dishwashers and kitchen equipment, and ACS asserts a lien on or ownership of that equipment and a claim in the approximate amount of $3,652.00.

As part of the proposed sale, McConnell will assume the leases with ACS in their entirety. To any extent these equipment leases constitute disguised security agreements on assets belonging to the Debtor, Buyer is purchasing such assets of ACS subject to the existing liens, claims, and encumbrances of ACS. Upon consummation of the sale, this debt will paid in full or assumed by the purchaser.

Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate.

Class 7. **Administrative Claims.** Priority, unimpaired. This class consists of the administrative claims of the estate's professionals, quarterly fees of the United States Trustee, and any unpaid post-petition operating expenses. Professional fees incurred through the date of confirmation will be paid only after court approval.

All remaining, unpaid post-petition operating expenses of the Debtor will be assumed or paid by the purchaser at the closing of the Sale. The Debtor will pay from its operating account all first and second quarter fees prior to closing of the Sale. Where necessary, any and all fees of

the estate's professionals will only be paid after Court approval. Though the purchaser of the Debtor's assets is purchasing the Debtor's cash assets, the purchaser has specifically agreed to allow the estate to retain funds to pay the Debtor's professionals in full through the closing of this case, in the approximate amount of $120,900. To any extent these funds are insufficient to pay all approved professional fees of the estate, the professionals will share this fund pro rata. To the extent there are any funds remaining in the estate after payment in full of all court-approved professional fees, the remaining funds will be property of and remitted to the purchaser of the Debtor's assets.

Class 8.    Georgetown County Finance Department.    Priority, unimpaired. The Georgetown County Finance Department asserts a hospitality tax claim against the Debtor in the approximate amount of $205. In connection with the closing of the proposed sale, McConnell agrees to pay or assume this tax obligation in full.

Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate.

Class 9.    Georgetown County Treasurer.    Priority, unimpaired. The Georgetown County Treasurer asserts a property tax claim against the Debtor in the approximate amount of $52,936.00. This amount is composed of a regularly administered tax of approximately $46,675.00 and a late penalty of approximately $6,261.00. In connection with the proposed sale, McConnell agrees to pay or assume the regularly scheduled tax obligation of $46,675.00 in full. The penalty claim of $6,261.00 will be paid in full from funds remaining in the estate specifically provided for in the budget and set aside for the payment of this penalty claim. In connection with the closing of the proposed sale, McConnell agrees to pay or assume this tax obligation in full.

Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate.

Class 10.    South Carolina Department of Revenue ("SCDOR").    Priority, unimpaired. SCDOR asserts a claim for admissions taxes in the approximate amount of $11,819.00, a claim for liquor taxes in the approximate amount of $105.00, and a claim for sales taxes in the approximate amount of $4,019.00. The aggregate amount of the SCDOR claim is $15,943.00. In connection with the proposed sale, McConnell agrees to pay or assume the SCDOR tax obligations in full. In connection with the closing of the proposed sale, McConnell

agrees to pay or assume this tax obligation in full.

Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate.

Class 11.    Reserve Golf Club of Pawley's Island, LLC Legacy Employees ("Employees"). Priority, unimpaired.    Substantially all Employees will become employees of McConnell upon closing of the sale, without any meaningful interruption of work schedule or pay schedule.  As of the petition date, Employees asserted claims in the approximate amounts of $37,476.00 for wages payable.  During the period between filing of the petition and closing of the sale, unpaid wages earned prepetition have been paid pursuant to Court Order.  Postpetition wages have been or will be paid in the ordinary course of the Debtor's business from the Debtor's operating cash.  At Sale closing, any and all remaining employee claims are being assumed in full by McConnell.  Therefore, the claims of employees have been paid or are being assumed in full.

Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate.

Class 12.    General Trade Creditors.    Unsecured, unimpaired.    This class consists of all general unsecured trade creditors of the Debtor, including any contract rejection claims and any remaining deficiency claims of undersecured creditors.  Debtor estimates that the aggregate amount of known unsecured trade claims is approximately $95,229.00.

In connection with the proposed sale, McConnell agrees to assume all claims of this class in full.  Upon closing of the sale, members of this class will be paid in full or have their debts assumed by the purchaser.

Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate.

Class 13.    Asserted Contingent Claims of Golf Club Members of the Reserve Golf Club of Pawleys Island, LLC. Unsecured, impaired.    This class consists of the asserted contingent claims of all active, active resigned, and inactive resigned golf club members of the Reserve Golf Club for unpaid membership or initiation fee refunds.  Golf club members have asserted claims for refunds of membership/initiation fees pursuant to the Debtor's Plan for the Offering of Memberships (the "Membership Plan"), which is the contractual document governing the rights of all of the Debtor's golf club members.

12

In connection with the proposed sale, all memberships of the Reserve Golf Club shall be terminated upon sale closing. Pursuant to the Asset Purchase Agreement in this matter, the purchaser has agreed to provide all active, active resigned, and inactive resigned members of the Debtor's golf club with the opportunity to become members of the purchaser's new golf club, provided such members satisfy any and all outstanding fees and dues owed to the Debtor, and further provided that such members have not already received a membership/initiation fee refund. The purchaser has further agreed to extend a similar service package as members enjoyed under the Debtor's regime.

The Debtor estimates that the total amount of asserted, contingent claims of the Dissident members of the club that might be included in this class, based on the October 2009 pre-petition vote of members, is between $618,091 and $1,996,991. The aggregate face value of all asserted contingent claims in this class remains unknown, but the Debtor estimates that the total face value of such asserted, contingent claims, if allowed, might be approximately $6,880,251.

Under the terms of the Membership Plan, an October 2010 pre-petition vote of all active, active resigned, and inactive resigned members, the members of the Debtor voted, by more than the required 2/3 majority to approve the Debtor's proposed sale, eliminate entirely any refund of membership or initiation fees, and permanently extinguish the right of any shareowner to the redemption of their equity contribution. This pre-petition vote resulted in the supermajority of golf club members and the supermajority of shareowners approving the sale, extinguishing all rights to membership/initiation fee refunds, and extinguishing any rights of shareholders to refunds of equity contributions.

Included as a part of the Purchase Price is an escrow account held in trust by third-party counsel (the "Escrow"), containing $66,250 that represents donations from certain of the Debtor's golf club members and homeowners within the Reserve community. Pursuant to the Escrow agreement, these funds were to be included as an additional part of the McConnell Purchase Price earmarked for a settlement of the asserted dissident member claims upon completion of the Debtor's proposed sale to McConnell on or by a certain date. The funds in that Escrow were specifically not to be used for any other purpose and, in the event of a sale to another bidder or no sale at all, were to be returned to the donors.

The Debtor's initial Plan filed on March 5, 2010, which is being replaced by this Amended Plan filed on April 1, 2010, originally called for a pro rata distribution of the Escrow to active, active resigned, and inactive resigned members who elected not to join the purchaser's

13

new golf club in settlement of their allowed claims. However, the Amended Disclosure Statement and Amended Plan now before the Court call for the return of the entirety the Escrow fund to the donors of such fund based upon the Court's findings in the March 23, 2010 Order Approving Sale that Dissident members were bound by the October vote and their claims for membership/initiation fee refunds were extinguished as a result of such vote. The Debtor further notes that, to the detriment of the Debtor and its estate, the Dissident members refused to settle their claims for the amount of the Escrow, and repeatedly attempted to block and/or delay the Debtor's Sale, which frustrated the purpose of the Escrow.

**All claims in this class were extinguished pursuant to the October 2009 pre-petition vote of affected members, and these asserted contingent claims shall be disallowed. There shall be no cash distributions of any type to any active, active resigned, or inactive resigned members for asserted, contingent claims based on membership/initiation fee refunds.** The Debtor specifically reserves its right, to any extent necessary, to object to asserted claims within this class prior to the closing of the case.

**Upon confirmation of the Plan, members of this class shall have no remaining claims against the estate, and the Escrow fund shall be returned to the donors of such fund.**

Class 14. Shareholder Members of the Reserve Golf Club of Pawleys Island, LLC. Equity Holders, impaired. This class consists of the equity interests of members of the Reserve Golf Club of Pawleys Island, LLC (collectively the "Equityholders") who are shareholders of the Debtor. Pursuant to the October 2009 pre-petition vote of affected members, the Equityholders agreed by more than the requisite 2/3 supermajority to extinguish their right to a refund of any equity contributions upon the successful sale to the purchaser.

The Equityholders' equity interests in the Debtor shall be extinguished at confirmation, and the Debtor's estate will be making no distribution to members of this class for any equity claims. Upon confirmation of the Plan, members of this class shall have no remaining claims or interests of any type against the estate.

## VII.    LIQUIDATION AND OTHER ALTERNATIVES TO PLAN CONFIRMATION

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Bankruptcy Case; (b) the Bankruptcy Court could consider an alternative plan of reorganization or orderly

14

liquidation, or (c) the Debtor's Bankruptcy Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code. These alternatives are described briefly below.

Dismissal

Were the Debtor's Bankruptcy Case dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. Any secured creditors would be expected to immediately exercise their rights as secured creditors to foreclose and seize the Debtor's assets. Dismissal would force a race among secured creditors and other creditors to take over and dispose of any remaining property of the Debtor. Furthermore, a dismissal of the Chapter 11 case would necessarily upset the agreement between the Debtor and McConnell designed to maximize returns to creditors. Upon information and belief, the Debtor believes that Plantation would enforce its lien against all real property of the Debtor, leaving the estate with few marketable assets.

Confirmation of an Alternative Plan

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan. If an alternative plan were proposed, it would more than likely be substantially similar to the current Plan in that it would propose to keep secured creditors unimpaired. Unlike the current plan, however, it would also likely contemplate the liquidation of the Debtor's few remaining Assets and the distribution of cash to creditors of descending priority, and eliminate the Debtor's business as a going concern. The Debtor believes that the Plan described herein enables the Creditors and all parties-in-interest to realize the best payout under the circumstances and any other alternative plan would not likely provide any greater return to Claimants. Upon information and belief, Debtor asserts that under any alternative plan, the Debtor's members will immediately resign in significant numbers and cease paying dues and fees, which will have the near-term effect of completely depleting the Debtor's already limited cash resources. This will, in turn, significantly diminish the value of the Debtor's assets to a prospective purchaser, as the membership base is the Debtor's most valuable asset.

Chapter 7 Liquidation

The primary advantage of the Plan over Chapter 7 liquidation is that holders of allowed general unsecured Claims in Classes 12 and 13 are likely to receive distributions, which would

not likely be available in a Chapter 7 case. Because the Plan contemplates that: (i) the Bankruptcy Court's involvement will diminish substantially after the Effective Date and (ii) the Debtor's counsel, who is already familiar with the Assets of and Claims against the Estate, shall continue the process of Claims resolution, without the necessity for additional investigation by a Chapter 7 Trustee and his/her separate new professionals, there will not be an additional layer of administrative expenses. In addition to the sale proceeds available through the Plan, the Plan also offers the opportunity of avoiding additional administrative costs and delays that would result from a Chapter 7 liquidation.

At a minimum, a Chapter 7 Trustee would retain his/her own counsel, who would ordinarily need to devote a substantial amount of time reviewing the status of Claims and getting up to speed on various matters. Such review would include a substantial amount of time duplicating tasks previously performed by other Professionals in the case, thereby increasing both the costs and the time necessary to liquidate the Estate. Also, the statutory fee paid to the Chapter 7 Trustee would further deplete the Estate.

If this case were converted to a Chapter 7 proceeding, cash distributions, if any, would be delayed for months because the Bankruptcy Court is required to establish an additional bar date for filing proofs of Claim against the Estate. Upon conversion to Chapter 7, unsecured creditors are given additional time to file Claims and governmental authorities are provided even longer to file their additional proofs of Claim. Upon expiration of the Chapter 7 bar dates, particularly given the high number of creditors in this case, the Chapter 7 Trustee and/or his attorney would likely require considerable time to review the Claims and undertake the Claims resolution process. Thus, not only would any dividends paid to creditors suffer because Chapter 7 professional fees would be paid at the expense of these Claims, but unsecured creditors would actually have to wait months longer for any distribution. Consequently, the Debtor believes that the Plan's lower total administrative costs and the more expeditious process of remaining in a Chapter 11 combine to result in higher recovery for creditors than a Chapter 7 liquidation could ever offer.

## VIII.  FEASIBILITY OF THE PLAN

It is provided in 11 U.S.C. §1129(a)(11) that in order for a Plan of Reorganization to be

confirmed, it must be demonstrated that the Plan of Reorganization is not likely to be followed by a liquidation or the need for further reorganization of the Debtor or any successor of the Debtor under the Plan unless the liquidation or reorganization is proposed in the Plan of Reorganization.  The Debtor is selling substantially all of its assets to a third party as approved by the Court, and the Plan is a plan of liquidation.  The net sales proceeds will be distributed to creditors according to this Plan of Reorganization.  The Plan is feasible because the purchaser has been identified, that purchaser has the ability to fund the purchase, the Court has approved the Sale, the closing of the sale has been set to occur soon, and the funds will be available for Debtor and purchaser to effect performance under the terms of the sale.

## IX. TAX CONSEQUENCES

The Debtor believes there are no adverse tax consequences to the Debtor or its creditors as a result of the bankruptcy and the provisions of the Plan but all creditors and parties in interest should consult their respective accountants and/or tax attorneys.

## X.  CONCLUSION

The Creditors, parties in interest, and readers of this Disclosure Statement are directed to the Plan of Reorganization for specific treatment of their particular claims against the Debtor.  The provisions of the Plan satisfy all undisputed claims against the Debtor.

RESPECTFULLY SUBMITTED on this the 1st day of April, 2010, at Columbia, South Carolina.

                MCCARTHY LAW FIRM LLC

BY:    /s/ Daniel J. Reynolds, Jr._____
        G. William McCarthy, Jr., I.D. #2762
        Sean P. Markham I.D. #10145
        Daniel J. Reynolds, Jr. I.D.#9232
        Attorneys for the Debtor
        1715 Pickens Street (29201)
        Post Office Box 12287
        Columbia, South Carolina  29211
        Tele:  (803) 771-8836
        Fax:  (803) 779-0267